# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Paul E. Plunkett | Sitting Judge If Other than Assigned Judge | Michael T. Mason |
|---|---|---|---|
| **CASE NUMBER** | 02 C 1823 | **DATE** | 12/23/2002 |
| **CASE TITLE** | Logan Graphic Products Inc vs. Textus USA Inc | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Report and Recommendation.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **3** | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | DEC 2 3 2002 | |
| | Notified counsel by telephone. | | date docketed | 50 |
| | Docketing to mail notices. | | CDL | |
| | Mail AO 450 form. | | docketing deputy initials | |
| ✓ | Copy to judge/magistrate judge. | | 12/23/2002 | |
| | | | date mailed notice | |
| MF | courtroom deputy's initials | | MF | |
| | | | mailing deputy initials | |

U.S. DISTRICT COURT
CLERK
02 DEC 23 PM12:40
FILED

Date/time received in central Clerk's Office

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LOGAN GRAPHIC PRODUCTS, INC. )
)
   **Plaintiff,** )
) No. 02 C 1823
  **v.** )
) Judge Paul E. Plunkett
TEXTUS USA, INC. (d/b/a Textus )
Industries, Inc. and Textus Art & ) Mag. Judge Michael T. Mason
Craft) and DAVID SMITH, )
)
   **Defendants.** )

## REPORT AND RECOMMENDATION

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Logan Graphic Products, Inc. ("Logan"), has filed a motion for preliminary injunction against defendants Textus USA, Inc. and its president David Smith (collectively, "Textus") for infringement of the trade dress associated with two of Logan's mat cutting products.[1] The District Court has referred the matter to us to conduct a hearing on the motion, which was held on November 12, 2002. For the following reasons, we recommend that the District Court GRANT the motion. In rendering this decision, the Court has considered the testimony of the witnesses, the documents admitted into evidence, the pre-hearing and post-hearing arguments and briefs of the parties, and the relevant case law. Pursuant to Fed.R.Civ.P. 52, we make the following findings of fact and conclusions of law.

## Background

---

[1] Logan also accuses Textus of false advertising under the Lanham Act and unfair competition and deceptive trade practices under Illinois law.

For the past twenty-eight years, Logan has manufactured and sold various types of mat-cutting products and accessories, and is currently the United States' largest manufacturer of mat cutting equipment.[2] (Tr. pp. 28, 30)[3] The products primarily at issue in this case are Logan's #301 Compact (the "Compact") and #401 Intermediate (the "Intermediate") mat cutting systems as well as Logan's straight-edge and bevel-edge cutting tools, which are sold both individually as well as with the Compact and Intermediate. Logan contends that through years of extensive advertising, marketing, and sales efforts, its products are well-known and distinctive and are identified by consumers as Logan products simply by appearance. The evidence presented at trial demonstrates that Logan is an industry leader in the mat cutting equipment business and that even its competitors agree that Logan's products are high quality and well-known. (Pl. exh. 5).

Within the past twelve to eighteen months, Textus, for the first time, entered the mat cutting equipment industry by advertising and then offering for sale two cutters designed to compete with Logan's. (Tr. pp. 163 - 164). Textus has displayed and marketed its "Home Pro" and "Studio Pro" mat cutting systems and related tools at several large art supply conventions in the past year, and does not deny that its products employ some of the same features as Logan's Compact and Intermediate systems. (Def. post hearing brf. at 3).

---

[2] These products are used to cut and size the heavy decorative cardboard mats that surround many framed pictures, posters, and other artwork.

[3] Citations to the hearing transcript will take the form "Tr. pp. xx". Citations to exhibits will take the form "Pl./Def. exh. x".

Instead, Textus argues that Logan is not entitled to trade dress protection with respect to its products because all of the allegedly unique and non-functional aspects of the systems' trade dress are actually fully functional and necessary components that previously made up the claims of Logan's now-expired patents on the Compact and Intermediate. Thus, Textus argues, Logan is attempting to wrongly prolong its monopoly in the mat cutting industry by contending that certain aspects of its products that previously enjoyed patent protection now should be entitled to trade dress protection.

*Comparison of the Products*

Each of the mat cutting systems at issue, Logan's Compact and Intermediate and Textus' Home Pro and Studio Pro are basically comprised of four separate components: 1) the mat cutting board, which is a piece of black vinyl laminate either 32 inches long (Compact and Home Pro) or 42 inches long (Intermediate and Studio Pro) and approximately 8 or 10 inches wide, respectively, on which a piece of mat board is placed for cutting. Each cutting board has two silver metal guide rails, one adjustable, which slides through routed channels, and one stationary, under which the piece of mat board is placed prior to its being cut,[4] a ruler consisting of a black sticker with white numbering that partly bisects the width of the board, and the previously mentioned routed channels in which the guide system moves back and forth depending on the size

---

[4] On the Intermediate and Studio Pro, this bar is on a hinge that the user lifts open to place the mat board underneath for cutting, at which point the hinged bar is lowered back to the surface of the mat board. On the Compact and Home Pro, the bar is attached with screws and only rises several millimeters, enabling the user to slide the mat board underneath. Logan explained that the Compact did not have a hinge because the company wanted to keep the price of the product low, so it used a tension mounted bar instead. (Tr. pg. 58).

of the mat to be cut; 2) a "push type" bevel cutter that attaches to the mat cutting board and is pushed through the mat board to create a beveled edge; 3) a "pull type" bevel cutter that is attached to the mat cutting board and is pulled through the mat board to create a beveled edge; and 4) a straight edge cutter that is attached to a mat cutting board to create a straight edge in the mat. (Pl. exh. 28 (Compact), 29 (Intermediate), 30 (Home Pro), 31 (Studio Pro), 19 (pictures of Logan and Textus pull type cutters), 18 (pictures of Logan and Textus push type cutters), 7 (Logan sell sheet, including a picture of a straight edge cutter), 10 (Textus sell sheet, including a picture of a straight edge cutter)).

Textus designed its Home Pro to compete with Logan's Compact, and its Studio Pro to compete with Logan's Intermediate. (Tr. pp. 163 - 164). All four component parts in each of Textus' mat cutting systems are nearly identical in appearance to the corresponding parts made by Logan. The boards are the same size, shape and color, and have identical metal adjustable and stationary guard rails attached to them. The routed out guide channels are the same except for the fact that Textus's channels are lined with a metal insert and Logan's are not. Every screw holding each product together is in the same location and is generally the same size and color. Textus' Home Pro uses a tension spring to attach the stationary guide rail like Logan's Compact, and its Studio Pro uses a hinge, like the Intermediate. Both boards have a sticker affixed in the same place that depicts nearly identical rulers. But for a sticker on the metal guide rail portion of each cutting board which says either "Textus" or "Logan", there is nothing to distinguish the appearance of the two boards.

The three cutting tools that attach to the boards are nearly identical between the

4

two companies as well. First, both the push and pull types of the bevel cutting tools are comprised of a black, extruded metal "base"[5] that has a flat bottom with a slanted wall rising out of the middle, on which a silver cutting tool is fastened. The base attaches to the mat guide on the main cutting board in such a way that it can slide back and forth along the guide as it cuts. The silver part holds a blade and pivots up and down on the base to lower the blade through a slot in the base to reach the mat. The difference between the "push type" and "pull type" of the bevel cutters is that the silver piece on each is shaped differently, so that the user can push the "push type" cutter and pull the "pull type" cutter. Both companies' straight cutter also consists of a black metal extruded "base" with a silver blade attached. Additionally, both straight cutters have a gray molded "bicycle grip" handle sticking straight up off the base, which the user holds to pull the cutter through the mat. All of the cutters have small black and white stickers on them that identify the product as belonging to either Textus or Logan.

*Logan's Previous Patents*

Although Textus contends that two of Logan's now expired utility patents covered certain aspects of the Compact and Intermediate, the evidence shows that only one of these patents, the so-called '977 patent, actually relates to the two Logan cutting systems at issue here.[6] The '977 patent covers Logan's pull and push type cutters, in that they are comprised of a slot through which a blade pivots up and down in order to

---

[5] The word "base" is ours and used for descriptive purposes only; Logan's witness on the issue referred to that part of the cutting tool as an "extrusion".

[6] Textus argues that the other patent, known as the '827 patent, covers the straight edges, rail and hinges of Logan's Intermediate and Compact. However, Logan adduced evidence at trial – which Textus did not controvert – that the '827 patent covered an entirely different mat cutter sold by Logan, the so-called 650. (Tr. pp. 134-137).

be able to cut a beveled edge at a 45 degree angle while avoiding any bending of the blade. The patent does describe the base to which the blade is attached and explains that the cutter is attached to a straight edge bar, although the bar described in the '977 patent is not attached to a board like the Compact or Intermediate, but instead is a free-standing bar that is anchored to a table by a completely different mechanism. (Pl. exh. 13; Def. exh. B, fig. 10). Nothing in the '977 patent refers to the color, shape or size of the mat cutting board, the shape of the silver metal handles on the push and pull type bevel cutters or the shape or color of the handle on the straight edge cutter. Indeed, the pictures of the bevel cutter on the Logan patent provided by Textus actually shows a cutter with a completely different shaped handle, this one comprised of two knobs that stick out away from the base on which the users hands rest. (Def. exh. B).

*Comparison of Competitors' Products*

At the hearing, Logan presented evidence regarding the appearance of some of its competitors' products. Two of its major competitors are Alto and Fletcher, and Logan produced numerous print catalogues of art supply equipment that depicted mat cutting systems by Logan, Alto and Fletcher. Although all three systems are comprised of similarly sized boards on which are attached various types of guide rails, the overall appearance of each company's product is different. For example, neither Alto nor Fletcher use adjustable routed guide rails on their systems. And although Logan's (and Textus') adjustable and stationary guide rails do not extend past the edges of the cutting surface of the board, Fletcher's single fixed guide rail extends past the length of the board on both ends and Alto's hinged rail has long handles with holes or slots cut in them that extend past the board's edge on one side. (Pl. grp. exh. 25, Dick Blick Art

6

Materials catalogue, pp. 170 - 171).

Further, the individual cutting tools produced by Logan's competitors all look quite different from each other, even though each one has some sort of base and handle and is used to cut a beveled or straight edge in a piece of mat board. (Pl. exh. 16, 17). For example, most of Logan's competitors use plastic, as opposed to metal, handles, and each has a different grasping mechanism, many of which protrude from the cutter's base.[7] In contrast, the handles on both Logan's and Textus' bevel cutters, in addition to being identical in shape, are much smaller and require the user to mold his or her hand around the metal handle and base together. It was also not clear from the evidence adduced at the hearing whether Logan (and now Textus) are the only companies to produce a separate bevel cutter for pulling and pushing, but we did not see evidence that any of Logan's competitors made two different bevel cutters. And unlike Logan's, the straight edge cutters of many of its competitors did not include any sort of handle; Textus used a gray molded bicycle grip handle identical to Logan's on its own straight cutter. (Pl. exh. 9).[8]

Confusion of the Products

Logan presented evidence at the hearing, by way of affidavit, that several individuals familiar with the mat cutting industry mistook Textus' mat cutting systems for Logan's when they passed Textus' booth at an art supplies convention. (Pl. exh. 4, 5).

---

[7] As an illustration, Alto's cutter has a rounded handle with a grip that looks something like a bat's wing. Fletcher's handle is a large domed shape piece of plastic that is grasped with the entire hand.

[8] Logan competitors Fletcher, Dexter and X-Acto all make cutters that can be used to cut either a straight or a beveled edge. None of the cutters have protruding handles. (Pl. grp. exh. 25, United Mfrs Supplies Inc. catalogue, pg. 130).

7

One of the individuals was an art teacher and sales manager for an art supply store; the other was the president of Logan's competitor, Alto. Both affidavits stated that, not withstanding their long experience in the industry, they had mistaken Textus products for those of Logan, and believed that consumers would as well. Logan did not provide any specific evidence of customer confusion or purchases of Textus products because of the wrongful belief that they were Logan's.

*Advertising of the Products*

The evidence at the hearing demonstrated that mat cutting equipment is usually advertised, displayed and demonstrated outside of its packaging, although in some cases, large art-supply stores may offer products for sale still in their boxes. (Tr. pp. 44 - 48). Logan does not sell its products directly to consumers, but instead uses both sales distributors as well as sells to various retail suppliers. (Tr. pg. 30). It markets its products though print advertising, trade shows, demonstrations, television, and its retail customers' websites and catalogues. (Tr. pp. 31 - 34, 45). Further, the evidence showed that Logan spends approximately $150,000 per year advertising its products through various media, not including the advertising done by some of its wholesale customers who produce their own catalogues and other types of advertising media. (Tr. pp. 49 - 50).

Because Textus is new in the industry, it does not have an established means of advertising its products. However, there was evidence presented at the hearing demonstrating that Textus will use at least some of the same channels as Logan to sell its mat cutters. For example, Textus has already participated in several art supply trade shows also attended by Logan. (Tr. pp. 164 - 166). It has contacted at least one large

retailer of art supplies and convinced it to carry its product; the Textus cutting systems are now offered for sale on the retailer's website and at its store. (Pl. exh. 14)

**Legal Analysis**

In order to obtain a preliminary injunction, a party must satisfy five criteria. First, it must show: 1) some likelihood of success on the merits; 2) that no adequate remedy at law exists; and 3) that it will suffer irreparable harm if the injunction is not granted. *See Ty, Inc. v. The Jones Group*, 237 F.3d 891, 895 (7th Cir. 2001) *(citing Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 11 (7th Cir. 1992).* "If the court is satisfied that these three conditions have been met, then it must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. *Ty, Inc.,* 237 F.3d at 895. Last, the court considers whether and how the public interest will be affected if the injunction is granted or denied. *Id.* "This process involves engaging in what we term the sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Id.*

"Trade dress" is a term of art used to describe a product's overall image or appearance, including elements such as size, shape, color or graphics. *See Abbott Labs.* 971 F.2d at 20. Logan alleges that Textus has copied virtually every cosmetic aspect of its Compact and Intermediate cutters and thus it has a strong likelihood of succeeding on the merits of its claim.

Logan argues that Textus has impermissibly infringed on its trade dress in violation of § 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a). In order to demonstrate

entitlement to trade dress protection, a plaintiff must show 1) that its "overall image" is inherently distinctive or has acquired distinctiveness through secondary meaning; and 2) that the similarity of the defendant's trade dress causes a likelihood of confusion on the source or affiliation of the product. *See Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir.), *cert. denied*, 525 U.S. 929 (1998). A defendant may defend a claim of trade dress infringement by arguing that the alleged trade dress is really functional. *See Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1151 (7th Cir. 1994). "'In general terms, a product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article,' that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850, n.10 (1982) *cited in Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 163 (1995). The Supreme Court recently resolved a split in the circuits regarding whether a plaintiff can obtain trade dress protection when a product configuration is a "significant inventive component of any invention covered by a utility patent . . ." *Vornado Air Circulation Systems, Inc. v. Duracraft Corp.*, 58 F.3d 1498, 1500 (10th Cir. 1995), holding that the previous patent indicated that the item sought to be protected was functional. *See Traffix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2001). Within the opinion, the Court also held that the burden is on the plaintiff to demonstrate that its product's trade dress is non-functional; *codified at* 15 U.S.C. § 1125(a)(3).[9]

---

[9] Although Logan argues that the *Traffix* decision left open the question of burden regarding
(continued...)

### a. Likelihood of Success on the Merits

In order to demonstrate a likelihood of success on the merits, Logan must show that it has a better than negligible chance of success. *See Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 726 (7th Cir. 1998). In this case, Logan argues that it has a great likelihood of success on the merits of its claims because its mat cutting systems are both inherently distinctive and have acquired secondary meaning in the market. Judging the inherent distinctiveness of a plaintiff's trade dress requires the Court to consider such elements as whether the trade dress is unusual and memorable, conceptually separable from the product, and serves primarily as the designator of the product. *See Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.*, 40 F.3d 1431 (3d Cir. 1994), *cited in Publications Int'l, Ltd., v. Landoll, Inc.*, No. 96 C 5180, 1997 WL 769349 (7th Cir., Dec. 5, 1997). Logan claims that such items as the shape of the extrusions on its cutting tools, the size of its mat board, a consistent two-toned color scheme, and the use of vinyl laminate all combine to create a distinctive image that sets Logan's products apart.

We disagree with Logan that its mat cutting systems are inherently distinctive, because the trade dress Logan is trying to protect actually consists of product configuration, that is, the "look" of the various parts that make up the mat cutters such as cutting board, handle, etc. And courts in this circuit have found instances of inherent distinctiveness in product configuration cases extremely rare. As the Seventh

---

[9](...continued)

functionality and that Seventh Circuit precedent places the burden on the defendant, *see Thomas & Betts, infra*, its argument does not address the fact that Congress has codified the rule of *Traffix*.

Circuit has explained that the concern in product configuration is that protecting the trade dress could prevent competitors "from duplicating features whose value to consumers is intrinsic and not exclusively as a signifier of source." *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 657, (7th Cir. 1995) *cert. denied* 516 U.S. 1159 (1996) *reversed in part on other grounds by Thomas & Betts Corp. v. Panduit,* 138 F.3d 277 (7th Cir. 1998). And in this case, there is nothing inherently unique or unusual about Logan's mat cutters or tools, and their "look" is not conceptually separable from the product; the look **is** the product.

A more common way to prove entitlement to trade dress protection in product configuration cases is by showing that the product has acquired a secondary meaning, i.e., that consumers associate the appearance of the item with its producer, not with the product itself. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). In this case, Logan has provided the affidavits of two disinterested individuals familiar with the mat cutting industry who have stated that they identify the "look" of Logan's products with the Logan company itself. Specifically, the affidavits mentioned the combination of Logan's black and silver color scheme, the shape of the extrusions on the board, and shape of the castings on the cutting tools, among other things. Further, Textus has presented no evidence to counter Logan's argument that these features merely identify its products as Logan's; we heard no evidence that consumers of Logan products appreciate these features because of some intrinsic value, as opposed to their signifier of source.[10] We agree that Logan has a likelihood of success in proving that its mat

---

[10] For example, although Textus argues that Logan's "sell sheets" which discuss the features of its
(continued...)

cutting systems and accessories have acquired a secondary meaning. Indeed, it appears that in addition to Logan, many of its competitors' products have acquired their own secondary meaning; at the hearing, Logan's Vice President of Marketing and Sales identified many of Logan's competitors based on a quick review of a photo of such competitor's own mat cutters. (Tr. pp. 60 - 62). Further, evidence of secondary meaning may be shown through such factors as length and manner of use of a particular trade dress,[11] amount and manner of advertising, volume of sales, and place in the market. See Spraying Systems Co. v. Delavan, Inc., 975 F.2d 387, 393 (7th Cir. 1992). In this case, all of these factors favor a finding of secondary meaning for Logan. Textus did not present any evidence to counter Logan's argument that its products have acquired secondary meaning.[12]

Next, we find that Logan has demonstrated a better than negligible chance of demonstrating a likelihood of confusion among customers with regard to Logan's and Textus' products. Factors the court must consider in measuring the likelihood of confusion are: 1) the similarity of the trade dresses; 2) the area and manner of

---

[10](...continued)
products talk about the various functional aspects of the cutting systems, nowhere on these sheets does Logan tout the shape of its cutting tools or the extrusions on the boards as giving its products some intrinsic value. Further, although it advertises an ergonomic handle on its straight cutter, as we explain below, it is not the inclusion of an ergonomic handle that identifies the product as Logans, but one that has the appearance of a gray bicycle handle.

[11] Five years concurrent use of a particular trade dress weighs strongly in favor of a finding of secondary meaning. See Celex Group, Inc. v. Executive Gallery, Inc., 877 F.Supp. 1114, 1139 (N.D.Ill. 1995). In this case, the evidence shows that Logan has advertised and offered for sale its various cutting heads and cutting boards for between five and twenty years. (Tr. pg. 129).

[12] Indeed, the fact that Textus has admitted that it set out to compete with Logan, coupled with the fact that its products are nearly identical in appearance to Logan's, weighs in favor of our finding that even Textus believes that products with this "look" are associated with the Logan name.

concurrent use; 3) the degree of care likely to be used by consumers; 4) the strength of the plaintiff's trade dress; 5) actual confusion; and 6) intent of the defendant to pass off its product as that of the plaintiff. *Syndicate Sales, Inc. v. Hampshire Paper Corporation*, 192 F.3d 633, 636 (7th Cir. 1999.) Further, the court must compare the two trade dresses "in light of what happens in the marketplace, not merely by looking at the two. . . side-by-side." *Id.* (quoting *Meridian Mutual Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111,1115 (7th Cir. 1997).

In this case, the trade dresses are nearly identical and the evidence shows that it is likely that Textus' and Logan's products would be displayed or advertised together or near each other on many occasions, such as at trade shows, in catalogues, and at some types of public demonstrations.[13] (Tr. pg. 34). The parties did not present any evidence regarding the degree of care likely to be used by consumers. There was also no evidence that Textus was trying to pass its products off as those of Logan.[14] The evidence shows that within the mat cutting industry, Logan's trade dress is fairly strong, a finding supported by the fact that Textus designed its products to look exactly like Logan's in order to compete specifically with Logan. Finally, although the affidavits Logan presented at the hearing demonstrate actual confusion by two individuals, we find that they are only entitled to some weight, not enough to be dispositive of the issue

---

[13] Additionally, most mat cutting products are advertised side-by-side in catalogues, and the pictures used to display them are fairly small. A customer scanning the catalogue for a Logan product could easily mistake a Textus product for that of Logan and order from Textus instead.

[14] Logan presented some hearsay evidence that Textus has told prospective customers that its products were just like Logan's except less expensive. However, even if we were to consider this hearsay testimony, which we will not, such evidence only shows that Textus is trying to compare itself to Logan, not pass off its products as Logan's.

since the evidence presented was limited and did not involve actual consumers of the products.

Another consideration in determining whether there is a likelihood of confusion – especially in product configuration cases – is the way that the product is labeled and packaged. In such cases, consumers often can look to the packaging, trademarks and advertising of the products to determine their source, and such aspects are typically much less likely to be confused with those of a competitor. *See Syndicate Sales*, 192 F.3d at 637. That is, even if two competing products look similar when placed side-by-side, if they are packaged differently, the likelihood of consumer confusion diminishes appreciably. However, there are cases in which distinctive packaging or labeling will not prevent confusion. *See Thomas & Betts*, 138 F.3d at 297 (where distributors repackaged products before offering them for sale, packaging could not eliminate likelihood of confusion.) In this case, the evidence shows that mat cutting products are very often displayed, advertised and/or demonstrated outside of their packaging, and thus, we find that packaging alone is not enough to prevent confusion.

With regard to labeling of the products themselves, although each product carries a label identifying it as a Textus or Logan product, the labels are not overly prominent or distinct from each other (both employ black and white lettering and simple graphics), and are not always visible in print or internet advertising. Further, the cutters are often sold via live customer demonstrations, and thus, it is likely that a piece of mat board, or the demonstrator's hand, might obscure the label from a potential customer. Thus, the products' different labels is also not enough to prevent confusion. Given the above factors, we conclude that Logan has demonstrated enough of a likelihood of

15

confusion to sustain its burden on this issue.

*Functionality and the Traffix Decision*

The legal requirements for trade dress protection aside, Textus argues that
Logan cannot possibly succeed in its quest for a preliminary injunction because it has
no protectable interest in its products now that the patents have expired, and thus,
cannot demonstrate a likelihood of success on the merits. That is, because Logan's
alleged trade dress is actually made up of functional elements that were previously part
of its patents, it cannot demonstrate a violation of the § 43(a) of the Lanham Act.
*Traffix Devices, Inc. v. Marketing Displays, Inc., supra.*[15] Textus argues that its mat
cutting products and those of Logan could be nearly identical in appearance and Logan
still would not succeed, since Textus is fully justified in copying a product whose patent
has expired.

Textus' arguments are misplaced. The *Traffix* decision involved a claim of trade
dress infringement in which the plaintiff was claiming that its protected trade dress was
the exact mechanism that had formerly been subject to a patent – a dual spring
apparatus for keeping road signs from falling over in the wind. *Id.* The plaintiff
contended that the public identified the dual spring design with plaintiff's product and
company, and thus, defendant was infringing on plaintiff's trade dress. The Supreme
Court held that where an expired utility patent claimed the exact features that were
currently the subject of a claim of trade dress infringement, the plaintiff "must carry the

---

[15] Additionally, Textus argues that because of the *Traffix* case and the inherent functionality of the
items Logan is claiming as trade dress, Logan will be similarly unable to succeed in proving any of the other
factors for a preliminary injunction.

heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device." *Id.* at 30.

In this case, neither party presented extensive evidence on the exact scope of the patent claims. Textus argues that nearly every aspect of Logan's mat cutting system is claimed in its patents and thus, pursuant to the *Traffix* case, these aspects are functional and not entitled to trade dress protection. As we explained above, Textus never controverted Logan's contention that its '827 patent was for a mat cutting system not at issue in this case, and thus, we will not address any arguments concerning this patent. As to the '977 patent, we find that the parts of the cutting system claimed therein are separate from the trade dress Logan is trying to protect. Logan's trade dress arises from the exact shape and color scheme of its mat cutting systems and tools. These aspects were not part of the patent. Instead, the patent protected a cutting tool in which a blade pivoted on a base and slipped through a slot to cut. Logan would run afoul of the *Traffix* case if it, for example, argued that its trade dress was comprised of a blade pivoting through a slot and consumers associated the blade and slot with Logan. There is nothing to prevent Textus from designing a cutting tool with such a mechanism. Indeed, many of Logan's competitors have pivoting cutting tools. Instead, Logan seeks to protect the way it has designed its products to look while they incorporate the previously patented features. Thus, we find the *Traffix* case inapplicable to this situation.

Even though we find that the *Traffix* decision does not control our decision, Logan must still carry its burden of showing that its claimed trade dress is non-functional. Textus argues that Logan cannot possibly demonstrate non-functionality

because every aspect of its cutters has a use. This is not an exactly correct definition of functionality. As we explained above, proving non-functionality requires Logan to demonstrate that its claimed trade dress is not essential to the use of its mat cutters and does not affect the cost or quality of the cutters such that a competitor would be at a disadvantage if forced to omit some part of the claimed trade dress from its product. We find that Logan has shown a likelihood of proving that none of its claimed trade dress is functional. Although in a product configuration trade dress case such as this one, it is nearly impossible to escape the usefulness of each aspect of the product, Logan's trade dress claims focus on the way these aspects look, not the way they perform.

Textus may, within the law, develop a mat cutting system that consists of a board with metal guide rails, a scale, and cutting tools, with or without handles. These are all functional aspects of a mat cutting system. It is just the fact that Textus' product incorporates these features in a way that is identical to Logan's in appearance that infringes on its trade dress. The infringement is most obvious with respect to the cutting tools. Logan's presentation of pictures of many of its competitors' tools demonstrates that each company has a different "look" that helps identify it in the industry. And yet Textus chose a shape, style and color scheme that was identical to Logan's, down to the placement of every screw. Further, we find that Logan's use of a "bicycle handle" grip on its straight cutter is non-functional. Logan is not objecting to Textus' use of a handle, or even a handle that is ergonomically designed. Many of Logan's competitors incorporate molded handles in their cutting tools. But Textus chose a gray, bike grip handle that is indistinguishable from Logan's and which the evidence shows helps

18

consumers identify the Logan company. With respect to the cutting boards, although the various component parts might all be functional in order for Textus to create a product that succeeds in cutting a mat board, the evidence shows that Logan's exact means of designing and putting the component parts together is by no means necessary to compete in the marketplace. *See Abbott Labs.*, 971 F.2d at 21.

The *Abbott Labs* case in instructive on this issue. In that case, defendant Mead sought to introduce a product that competed with Abbott's successful electrolyte replacement therapy, Pedialyte. Mead's product, Ricelyte, was packaged in a square-shaped clear plastic bottle with ridged indentations, nearly identical to the bottles used by Pedialyte. The District Court held that the square shape was functional because they are easier to ship and store than other shaped bottles, and thus, Abbott could not claim trade dress protection in its bottle. The Seventh Circuit reversed and remanded because Mead failed to demonstrate that not only did the square bottle have certain advantages, but requiring it to change its bottle's shape would have a materially adverse effect on its ability to compete in the market. *Id.*[16] In the instant case, Logan has provided evidence that its trade dress in not required for effective competition, since all of its competitors' products employ different "looks" for their mat cutting systems and tools.

We also must comment about the use of color as an indicator of trade dress. Textus argues that Logan's selection of a black board and base with metal attachments is purely functional and would be costly to design around because the black color

---

[16] At the time of this case, the burden was still on the defendant to demonstrate functionality.

provides contrast to the mat being cut[17] and the attachments are metal naturally. Logan argues that its color selections were purely arbitrary and that black is by no means the only logical color for a board, since mat board comes in a variety of colors, including dark ones. In this case, we find that Logan's use of a black and silver color scheme is more of a neutral factor in our analysis. That is, we are not convinced that the color combination is either necessary or sufficient to identify the mat cutters as Logan's. We can envision a black and silver mat cutter and accessories with a totally different shape than the Compact or Intermediate that does not bring to mind Logan's trade dress, and similarly can picture a mat cutter identical to Logan's but for the color that still causes customer confusion.

In sum, we find that Logan presents a fairly strong likelihood of success in demonstrating that Textus has infringed upon its trade dress because it has copied those aspects of Logan's products that the consuming public uses merely to identify the products as Logan's. This likelihood means that Logan has less to prove with respect to the other factors for a preliminary injunction. *See Abbott Labs.*, 971 F.2d at 11. However, as we explain below, it succeeds in demonstrating these factors as well.

**b.    Inadequate Remedy at Law and Irreparable Harm**

In cases of trade dress infringement, an inadequate remedy at law and irreparable harm from the loss of customer goodwill are nearly always presumed. *See*

---

[17] At the hearing, Textus presented, but did not introduce into evidence, mat boards that were identical to Logan's except for the fact that they were gray instead of black. There was some testimony that Textus is planning on manufacturing gray boards, but the Textus boards introduced into evidence were black and Textus continues to argue the functionality of the black color in its post-hearing brief, so we will not consider the effect of the color change.

*Processed Plastic Co. v. Warner Communications*, 675 F.2d 852, 858 (7th Cir. 1982). In this case, we find this an appropriate presumption to make, especially given Logan's strong reputation in the industry and long history of sales. Thus, we must address the final two factors that bear on the decision whether to grant a preliminary injunction.

### c. Balance of Harms/Public Interest

We find that both the balance of harms and the public interest favor granting Logan's request for a preliminary injunction. Textus is a very new entrant into the mat cutting industry; at the time of the hearing it had not begun producing its products for sale in the marketplace and it had only one contract to sell to a retailer. Thus it would not suffer undue hardship if required to change the appearance of its products prior to advertising and offering them for widespread sale.[18] In contrast, Logan could be harmed if customers mistake Textus' products – which Logan contends are inferior in performance – with its own. And finally, the public interest supports an injunction because in trade dress and trademark infringement cases, it is presumed to be in the public interest to eliminate customer confusion. *See Health o meter, Inc. v. Terraillon Corp.*, 873 F.Supp. 1160, 1176 (N.D.Ill. 1995), *appeal dismissed*, 52 F.3d 342 (Fed.Cir. 1995).

### False Advertising/Unfair Competition and Deceptive Trade Practices Claims

Logan also contends that, although the two companies' products look nearly identical, Textus' products are vastly inferior in performance, and thus, its claims to prospective customers that its mat cutting products are the same as Logan's constitutes

---

[18] Indeed, as we explained above, there was at least some evidence presented at the hearing that Textus may have changed the color of its mat boards with little difficulty soon after the lawsuit was filed.

false advertising under the Lanham Act, § 43(a)(1)(B). Neither party spent any time at the hearing or in their briefs addressing this issue or the question of violation of Illinois law. However, all of Logan's other causes of action stemmed from Textus' use of an identical trade dress, and the other damages that might flow from such infringement. Since we recommend that an injunction is appropriate on Logan's trade dress claim, it is not necessary at this point for us to consider the other aspects of Logan's complaint; ordering Textus to alter its products so that they do not impermissibly infringe on Logan's trade dress should address Logan's other claims as well, at least until the conclusion of a full trial on the merits.

For the above reasons, we recommend that the District Court GRANT Logan's request for a preliminary injunction and enjoin Textus from advertising or offering for sale any mat cutting products that incorporate Logan's trade dress such that they are confusingly similar to Logan's Compact or Intermediate, or its bevel or straight edge cutting tools. As we explained above, we do not believe that in this situation, it would be sufficient for Textus to merely change the color of its products; it is Logan's color scheme combined with its products' shapes that constitutes the strength of its trade dress.[19] Thus, we recommend that the preliminary injunction require Textus to change the appearance of its mat cutting boards, and especially its cutting tools, so that shape of the extrusions, attachments, and handles do not mimic Logan's. This includes, but is not limited to, changing the shape and appearance of the handle on its straight edge

---

[19] Logan also contends that its use of vinyl laminate for its cutting boards is part of its trade dress. However, we saw no evidence that the use of this particular material is either unique in the industry or simple and not costly to design around, so we do not include it in our recitation of Logan's trade dress.

cutter and changing the shape of the metal blade attachments on its two bevel cutters. Textus must make similar changes to its cutting board so that it is not identical in appearance to Logan's.

Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(a). Failure to file objections with the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the report and recommendation. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

ENTER:

MICHAEL T. MASON
United States Magistrate Judge

Dated: December 23, 2002